[No. F071768. Fifth Dist. June 7, 2016.]

NARAGHI LAKES NEIGHBORHOOD PRESERVATION ASSOCIATION,
Plaintiff and Appellant, v.
CITY OF MODESTO, Defendant and Respondent;
BERBERIAN HOLDINGS, L.P., Real Party in Interest and Respondent.

**COUNSEL**

Law Office of Donald B. Mooney and Donald B. Mooney for Plaintiff and Appellant.

Meyers, Nave, Riback, Silver & Wilson and Edward Grutzmacher for Defendant and Respondent.

Downey Brand and Donald Sobelman for Real Party in Interest and Respondent.

**OPINION**

**KANE, J.**—Following the approval by the City of Modesto (the City) of a shopping center project (the project) that would be adjacent to an established residential neighborhood, Naraghi Lakes Neighborhood Preservation Association (appellant) filed a petition for writ of mandate challenging the approval of the project. Appellant claimed the City failed to follow the City of Modesto Urban Area General Plan (the General Plan), and did not adequately comply with certain requirements of the California Environmental Quality Act (CEQA).[1] The trial court denied the writ petition and entered judgment in favor of the City. Appellant appeals, contending the project was improperly approved and the petition should have been granted because, allegedly, (1) the project was inconsistent with the General Plan regarding the size of neighborhood shopping centers, (2) the City failed to make findings necessary

---

[1] CEQA is found at Public Resources Code section 21000 et seq.

Unless otherwise indicated, all further statutory references are to the Public Resources Code.

CEQA's policies are implemented through regulations known as the CEQA guidelines (Guidelines) found at California Code of Regulations, title 14, section 15000 et seq.

under the General Plan's rezoning policy, (3) the City failed to comply with CEQA because the environmental impact report (EIR) improperly rejected feasible mitigation measures as to traffic impacts, and (4) no substantial evidence supported the City's CEQA findings regarding urban decay and the statement of overriding considerations. Having reviewed appellant's contentions in light of the entire record, we are unable to conclude that the City prejudicially abused its discretion on any of the grounds raised. Accordingly, the judgment of the trial court is affirmed.

## FACTS AND PROCEDURAL HISTORY

*The Project Description*

The project proposed by real party in interest Berberian Holdings, L.P., is the construction of a new shopping center on approximately 18 acres of vacant land situated in northeast Modesto. The new shopping center, as proposed, will include approximately 170,000 square feet of floor area, with a grocery store serving as the anchor tenant. The proposed site of the project is two contiguous parcels, one 12 acres in size and one six acres in size, bounded by Sylvan Avenue (north), undeveloped land and a stormwater detention basin (south), Oakdale Road (east) and Hashem Drive (west). The completed project (i.e., the new shopping center) as proposed by real party in interest will have two large buildings, one that is 78,290 square feet and another that is 66,230 square feet, each of which will be partitioned into spaces for various tenants. The smaller building is planned to include a 51,730 square foot area for the anchor grocery store tenant. Four freestanding pad buildings, ranging in size from 4,200 square feet to 7,670 square feet, are also part of the overall project. The project calls for 816 parking spaces.

An established residential neighborhood borders the project site on the west side along Hashem Drive. The project will provide an eight-foot-tall masonry wall with a decorative cap along the west and south property lines. A 16-foot-wide landscaped planter on the west side of the masonry wall will provide a further buffer between the development and the residences to the west. The project will be required to provide layered landscaping, shrubs and ornamental trees in the 16-foot-wide planter area.

The project necessitates a General Plan amendment to redesignate the project site from mixed-use (MU) and residential (R) zoning to commercial (C), and to rezone the same property from planned development zone P-D(211) to a new planned development zone, to allow development of a shopping center.

*General Plan's Neighborhood Plan Prototype (NPP)*

There is no dispute that the project site is located within an area covered by the NPP policies of the General Plan. The General Plan, at chapter III, part C, paragraph 2, explains the purpose of the NPP policies as follows: "The [NPP] was developed in 1974 to provide a 'blueprint' for development of future residential neighborhoods. The [NPP] is designed to create residential areas served by neighborhood parks, elementary schools, a neighborhood shopping center, and a collector street pattern connecting these uses. The [NPP] is a model for: subdivision designs, location of parks and other capital facilities, and zoning and pre-zoning studies. As of the baseline year of 1995, much of the Baseline Developed Area has been developed according to this Prototype. [¶] Within the Modesto community, 'Neighborhoods' are typically one mile by 3/4 mile (approximately 480 acres in size), and bordered by Arterial streets or Expressways."

The General Plan's NPP provisions then go on to describe the various *policies* that are applicable to the subject neighborhoods. After stating policies relating to housing types and the location of elementary schools and parks within each neighborhood, the NPP policies call for a neighborhood shopping center, described as follows: "A 7–9 acre neighborhood shopping center, containing 60,000 to 100,000 square feet of gross leasable space, should be located in each neighborhood. The shopping center should be located at the intersection of two Arterial streets, as shown in Figure III-2." (General Plan, ch. III, pt. C, § 2, ¶ d.)

*The Site's Entitlement History*

The same site has been approved for commercial development as a shopping center on two occasions prior to the instant project. Historically, the zoning for that location has been P-D(211), which allows condominium apartments and cluster houses. In 1981, the City approved a rezoning of the 12-acre parcel[2] to allow for the development of a shopping center at the corner of Sylvan Avenue and Oakdale Road. When that project did not get developed, the zoning was returned back to P-D(211). In 1987, the City again approved a request to rezone the 12-acre parcel for a shopping center development. When the planned shopping center did not proceed within the time limit for development, the City repealed the zoning changes and returned the zoning to P-D(211). The two shopping center entitlements previously approved (in 1981 and 1987) for this site entailed proposed developments that were approximately 12 acres in size with approximately 80,000 square feet of leasable space.

---

[2] Recall that the entire project site is 18 acres, consisting of two vacant parcels, one of 12 acres and one of six acres. The past entitlements involved the 12-acre parcel only.

*Real Party In Interest's Initial Application and City's Initial Environmental Study*

In November 2011, real party in interest submitted an application to obtain necessary approvals for the proposed project. As noted above, the project set forth in real party in interest's application consisted of a shopping center development on the 18-acre site at the corner of Sylvan Avenue and Oakdale Road, including approximately 170,000 square feet of leasable space with a grocery store as the anchor tenant. The completed shopping center would be called The Marketplace. It would also include an eight-foot-tall wall and landscaping as a buffer on the western side of the shopping center along Hashem Drive. Additionally, an integral part of the project was a General Plan amendment to redesignate the project site from MU and R to C and to rezone the same property from planned development zone P-D(211) to new planned development zone (P-D) to allow development of a shopping center on the project site.

On May 11, 2012, the City released the results of an initial study, which reported that the project was within the scope of the General Plan master EIR (MEIR) and that, pursuant to CEQA, no additional environmental review was required. The initial study concluded that the project would have no significant effects on the environment and was consistent with the General Plan and the MEIR. Regarding traffic impacts, the initial study included a traffic study prepared by the engineering firm of Kimley-Horn & Associates (the first traffic study).

The project was first brought before the City of Modesto Planning Commission (the Planning Commission) on August 6, 2012, and testimony was received. A second hearing before the Planning Commission took place on September 17, 2012. Appellant and individual residents of the neighborhood nearby the project site submitted letters stating their concerns or objections to the project due to apparent adverse impacts on the environment such as urban decay, traffic, noise, and General Plan inconsistency. The Planning Commission recommended approval of the project by the city council, and a public hearing before the city council was set for October 23, 2012.

On October 23, 2012, appellant submitted a detailed comment letter to the city council, setting forth purported deficiencies in the City's and/or the planning staff's assessment of the project's impacts. Appellant asserted that the project created significant traffic, noise, urban decay, General Plan inconsistency and other environmental impacts. In addition, appellant submitted a peer-reviewed traffic memorandum, prepared by VRPA Technologies, which asserted that the first traffic study used incorrect methodologies to measure traffic impacts. VRPA's memorandum asserted that when the proper

methodology was used, there were unmitigated traffic impacts of a significant nature at several intersections. The city council ultimately continued the public hearing to January 8, 2013.

On January 3, 2013, real party in interest submitted a letter to the city council, acknowledging that the most efficient course of action would be to prepare a project EIR, since that process would allow the issues raised in appellant's letter to be analyzed and put to rest. The project application was taken off of the city council's meeting agenda and the EIR process formally began with the notice of preparation on February 4, 2013.

*The EIR Process and Project Approval*

The draft EIR (DEIR) was completed on June 19, 2013, and a public comment period commenced on June 20, 2013, and continued through August 5, 2013. The DEIR included a new, much more extensive traffic analysis. Based on that analysis, the DEIR acknowledged the existence of significant traffic impacts that were allegedly unavoidable at several intersections and roadway segments near the proposed project. The City received only three comment letters on the DEIR, two from public agencies and one from appellant. Appellant's comment letter included a memorandum from its traffic consultant pointing out that the DEIR's analysis of traffic impacts had misapplied certain of the City's thresholds of significance. The City apparently agreed because it promptly revised the traffic report and the relevant sections of the DEIR and issued a recirculated DEIR (RDEIR) for public comment from August 26 to October 10, 2013. The City received only three comment letters on the RDEIR, the same three as before. Appellant submitted a comment letter concerning the RDEIR, outlining alleged deficiencies in the RDEIR's analysis of impacts, alternatives and mitigation measures. The City responded to all comment letters received on both the DEIR and RDEIR in the final EIR (FEIR).[3]

On November 18, 2013, after nine months of work on the EIR, the project returned to the Planning Commission. Testimony was received at the hearing. Appellant's attorney spoke against the project, emphasizing the significant impacts on traffic that would not be adequately mitigated and General Plan inconsistency, among other things. The Planning Commission believed the concerns expressed by appellant were adequately addressed in the EIR. At the conclusion of the hearing, the Planning Commission adopted resolutions recommending that the city council certify the EIR and approve the project.

---

[3] Unless otherwise indicated, the term EIR refers to the FEIR, which is understood to include and incorporate (1) the DEIR and the RDEIR, (2) all comments received, (3) the City's responses to comments or points raised in the review process, and (4) any other information added by the City. (Guidelines, § 15132.) We sometimes refer to the FEIR or DEIR separately, when it is helpful or convenient to do so.

On December 10, 2013, the city council held its first public hearing on the EIR and the project. Appellant submitted written objections to the project, including challenges to the EIR's conclusions regarding infeasibility of certain mitigation measures as to traffic impacts. At the conclusion of the hearing, the city council closed the public hearing and continued consideration of the EIR and project to allow staff time to review appellant's recent submittal to ensure that the EIR had fully and adequately analyzed all environmental impacts.

We note that the EIR in this case followed a standard organizational approach that sought to address all of the necessary issues. Among other things, it described the project, summarized the potentially significant environmental impacts, discussed development alternatives to the project, and analyzed mitigation measures, including a delineation of which measures were feasible and which were infeasible. Further, the EIR in this case included a detailed description of the project's traffic impacts at several intersections and roadway segments that would be significant impacts but mitigation would allegedly be infeasible. The EIR also purported to explain why the project, despite its size, was in harmony with the policies of the General Plan.

On January 7, 2014, the city council adopted resolutions Nos. 2014-16 through 2014-18, certifying the EIR and making necessary project approvals. The city council also conducted the first reading of ordinance No. 3597-C.S., which was approved on the consent calendar at the January 14, 2014, city council meeting. The approvals included certification of the EIR and other CEQA findings, approval of the project application, and amendment to the General Plan and zoning. The City posted a notice of determination regarding the project on January 8, 2014.

*Petition for Writ of Mandate*

On February 6, 2014, appellant filed its verified petition for writ of mandate and complaint for declaratory relief (the petition) in the trial court. On March 5, 2015, after full briefing on the issues and a hearing, the trial court denied the relief sought in the petition. In its written order, the trial court reviewed the record and rejected each of appellant's claims. No abuse of discretion was found by the trial court. Judgment was entered in favor of the City and real party in interest, and against appellant, on March 30, 2015. This appeal followed.

## DISCUSSION

### I. General Plan Consistency

Appellant argues the project was in conflict with the General Plan in several key respects and that, consequently, the City abused its discretion in approving the project. Among the claims of General Plan inconsistency, appellant argues that the project did not comply with the NPP policy regarding the size of the shopping center, and that certain mandatory findings necessary to rezoning of the site were not made. We begin by summarizing the applicable law and the standard of review relating to challenges based on alleged General Plan inconsistency.

### A. *Applicable Law and the Standard of Review*

■ A city must adopt a "comprehensive, long-term general plan" for its physical development. (Gov. Code, § 65300.) The general plan serves as a " 'charter for future development' " and contains the city's fundamental policy decisions about such development. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1194 [24 Cal.Rptr.3d 543].) The policies in a general plan typically reflect a range of competing interests. (*Ibid.*; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142 [104 Cal.Rptr.2d 326] (*Save Our Peninsula*).) "General plans ordinarily do not state specific mandates or prohibitions. Rather, they state 'policies,' and set forth 'goals.' " (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 378 [110 Cal.Rptr.2d 579] (*Napa Citizens*).) Nevertheless, a city's land use decisions must be consistent with the policies expressed in its general plan. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570 [276 Cal.Rptr. 410, 801 P.2d 1161]; *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 536 [277 Cal.Rptr. 1, 802 P.2d 317]; *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 815 [65 Cal.Rptr.3d 251] (*Friends of Lagoon Valley*); Gov. Code, § 65860.) " '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' " (*Citizens of Goleta Valley v. Board of Supervisors, supra,* at p. 570.)

■ The rule of general plan consistency is that the project must at least be *compatible with* the objectives and policies of the general plan. (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 717–718 [29 Cal.Rptr.2d 182] (*Sequoyah Hills); Friends of Lagoon Valley, supra,* 154 Cal.App.4th at p. 817.) "[S]tate law does not require precise conformity of a proposed project with the land use designation for a site, or

an exact match between the project and the applicable general plan. [Citations.] Instead, a finding of consistency requires only that the proposed project be '*compatible* with the objectives, policies, general land uses, and programs specified in' the applicable plan. [Citation.] The courts have interpreted this provision as requiring that a project be ' "in agreement or harmony with" ' the terms of the applicable plan, not in rigid conformity with every detail thereof." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678 [125 Cal.Rptr.2d 745] (*San Franciscans*).) To reiterate, the essential question is "whether the project is compatible with, and does not frustrate, the general plan's goals and policies." (*Napa Citizens, supra,* 91 Cal.App.4th at p. 378.)

■ As has been accurately observed by one court: "[I]t is beyond cavil that no project could completely satisfy every policy stated in [a city's general plan], and that state law does not impose such a requirement. [Citation.] A general plan must try to accommodate a wide range of competing interests . . . and to present a clear and comprehensive set of principles to guide development decisions. Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence. [Citations.]" (*Sequoyah Hills, supra,* 23 Cal.App.4th at pp. 719–720.)

Where, as here, a governing body has determined that a particular project is consistent with the relevant general plan, that conclusion carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion. (*Friends of Lagoon Valley, supra,* 154 Cal.App.4th at p. 816; *Napa Citizens, supra,* 91 Cal.App.4th at p. 357; *Sequoyah Hills, supra,* 23 Cal.App.4th at p. 717.) "We may neither substitute our view for that of the city council, nor reweigh conflicting evidence presented to that body." (*Sequoyah Hills, supra,* at p. 717.)

Moreover, judicial review of consistency findings is highly deferential to the local agency. (*Friends of Lagoon Valley, supra,* 154 Cal.App.4th at p. 816.) "[C]ourts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that 'the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a

range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role "is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." [Citation.]' " (*San Franciscans, supra*, 102 Cal.App.4th at pp. 677–678, quoting *Save Our Peninsula, supra*, 87 Cal.App.4th at p. 142.)

In our review of the City's consistency findings in this case, our role is the same as that of the trial court; we independently review the City's actions and are not bound by the trial court's conclusions. (*Napa Citizens, supra*, 91 Cal.App.4th at p. 357.) In applying the substantial evidence standard, we resolve reasonable doubts in favor of the City's finding and decision. (*Ibid.*) The essential inquiry is whether the City's finding of consistency with the General Plan was "reasonable based on the evidence in the record." (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 637 [91 Cal.Rptr.3d 571].) "[A]s long as the City reasonably could have made a determination of consistency, the City's decision must be upheld, regardless of whether *we* would have made that determination in the first instance." (*Id.* at p. 638.) Generally speaking, the determination that a project is consistent with a city's general plan will be reversed only if the evidence was such that no reasonable person could have reached the same conclusion. (*San Franciscans, supra*, 102 Cal.App.4th at p. 677; accord, *San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 26 [161 Cal.Rptr.3d 447] (*San Diego Citizenry Group*).)

## B. *NPP Policies*

Appellant first of all asserts that the project violates the NPP policies of the General Plan. The NPP policy provision at issue relates to the need for local shopping centers in the neighborhoods to which the NPP applies, and provides as follows: "A 7–9 acre neighborhood shopping center, containing 60,000 to 100,000 square feet of gross leasable space, should be located in each neighborhood." The same policy provision states that the shopping center "should be located at the intersection of two Arterial streets, as shown in Figure III-2."

We begin our consideration of this issue by noting how the City interpreted this General Plan policy in the proceedings below. The position taken by the City planning staff throughout the project review process, which was expressly adopted by the City in its findings approving the project, was that the project was consistent with the General Plan, including the NPP policies. The City concluded the project was consistent with the NPP policies because the

project (1) provided for a neighborhood shopping center and (2) was properly located at an intersection of arterial streets. Further, while it was acknowledged that the project was larger than the neighborhood shopping center described in the NPP policies, the City understood that the depictions set forth therein were meant to provide guidance in the orderly development of neighborhoods, but were not mandatory limitations on the size of shopping centers. In support of this flexible interpretation, it was noted by staff in the proceedings before the Planning Commission and the city council that several other shopping centers had been approved by the City that exceeded the NPP policy's acreage and square footage descriptions. As one staff report states: "It should be noted that since these policies were adopted, the City has approved eight neighborhood shopping centers that exceeded the size called for in this policy, and in each case the City found the project consistent with the General Plan." It was also noted by staff that for many years the market trend in grocery stores has been for higher square footage, which was represented by the developer to be more economically viable.

In the instant appeal, appellant disagrees with the City's flexible interpretation and takes the position that all of the policies and descriptions set forth in the NPP should be treated as mandatory development standards. Appellant emphasizes that the project at hand is double the acreage amount and 70,000 square feet above the total leasable space contemplated in the NPP. Further, appellant points out that the City did not update the wording of the NPP in either 1995 or 2008, the two most recent occasions on which the City updated its General Plan and, therefore, any attempt to dismiss the NPP as being an outmoded relic in need of updating does not comport with the City's conspicuous failure to revise it. Additionally, appellant argues the City's position that shopping center developments larger than what is depicted in the NPP have routinely been approved by the City is flawed, because not all of the referenced shopping centers were in areas covered by the NPP policies. Finally, appellant argues that if the policies in the NPP were simply flexible goals to guide development, there would be no need for paragraph (f) of the NPP policies, which provides for minor adjustments to accommodate existing development in an area.

The City and real party in interest (together respondents) have filed a joint respondents' brief in the instant appeal. Respondents insist that the NPP policy's enumerations of acreage and leasable square footage when describing a prototypical neighborhood shopping center were not meant as rigid development mandates, but rather were flexible descriptions to provide a basic model or pattern to guide the future development of the applicable

neighborhoods.[4] Respondents argue that the project, although bigger than the shopping center depicted in the NPP, was essentially compatible with its main goals of providing a needed neighborhood shopping center at the intersection of two arterial streets.

In support of their position, respondents rely on the plain language of the NPP policies as well as the City's history or past practice of flexibly interpreting the NPP policies. As to the NPP's wording, the terms "prototype" and "model" are used in the NPP to describe its overall purpose, which reasonably suggests that the policies stated therein were intended to provide a guiding pattern or a model for future development of applicable neighborhoods. Indeed, the NPP expressly states that it is "a model for: subdivision designs, location of parks and other capital facilities, and zoning and pre-zoning studies," and a " 'blueprint' for development of future residential neighborhoods." Further, the NPP states that it was "designed to create residential areas served by neighborhood parks, elementary schools, a neighborhood shopping center, and a collector street pattern connecting these uses." As the City planning staff put it in the proceedings below, "the policies were developed with the intent to provide guidance on how to arrange or lay out land uses in a neighborhood." Additionally, the use of the word "should" in the vast majority of the NPP policies, including the policy at issue in this appeal, while the mandatory term "shall" was used in one instance not applicable to this case, provides a reasonable basis for the more flexible construction of the acreage and square footage provision, as urged by respondents.[5] Based on the foregoing observations, we conclude that the wording of the NPP is reasonably consistent with the interpretation given to it by the City. Of course, we are required to accord "great deference" to the City's interpretation of its own General Plan. (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 142.)[6]

Appellant replies that the "[m]inor adjustments" clause in paragraph (f) of the NPP policies indicates strict compliance should be required as to all

---

[4] We note that the subject NPP policy, which states that a "7–9 acre neighborhood shopping center" containing "60,000 to 100,000 square feet of gross leasable space" should be located in "each neighborhood" is not overtly phrased in terms of a mandatory cap or limitation. Thus, it may simply be *a descriptive estimate* of the usual or typical size of such a shopping center. Such a possibility fits the more flexible approach adopted by the City, with the City presumably having discretion to approve bigger or smaller centers when deemed advisable.

[5] Paragraph (g) of the NPP policies states a mandatory requirement: "If the expressway is a Class A expressway, there shall be no Collector streets intersecting with the expressway." Virtually all of the remaining policy statements use the word "should."

[6] We are not suggesting that the framing of the NPP in terms of policies and goals (i.e., using the word "should"), rather than as rigid mandates, renders them merely advisory in nature. The test of compatibility still applies. (*Napa Citizens, supra,* 91 Cal.App.4th at p. 378.) Nevertheless, in deciding on the question of compatibility, we believe the nature and flexibility of the policy under consideration are important factors.

policy terms, including the size descriptions for neighborhood shopping centers. We think appellant reads too much into that provision, which states in full that "Minor adjustments to the [NPP] can be made to accommodate existing development in an area." The provision is narrowly focused on what to do about *existing development* in an area. On that issue, it simply allows the City to work around existing uses or conditions on the ground; that is, it may make minor adjustments to accommodate for the same. Contrary to appellant's suggestion, the provision does not address the broader concern of whether to make all other NPP policies mandatory and binding limitations.

In addition to the plain wording of the NPP policies, respondents assert that "[t]he City's past practices also demonstrate the City's consistent construction of the NPP Policies as providing guidance to inform development, not inflexible mandates . . . [since] [t]here are multiple examples of the City's approval of shopping center projects that exceed the prototype in either acreage, square footage, or both." Respondents appear to be correct on this point. The two previous entitlements approved at the project site in 1981 and 1987 went substantially beyond the total acreage described in the prototype, each seeking to utilize 12 gross acres. The Lakes shopping center is located in an area covered by the NPP policies, and it exceeded the square footage parameters by 4,000 square feet. Other examples identified by respondents and mentioned in the record include the Standiford Square shopping center (at 10.22 acres and 112,579 sq. ft.), the Dry Creek Meadows shopping center (at 11.25 acres and 112,146 sq. ft.), and Wood Colony Plaza (at 13.76 acres and 171,171 sq. ft.), the latter being larger than the project in total square footage.[7]

Appellant counters that at least two of the prior shopping center developments referenced by the City staff in the proceedings below (i.e., the Crossroads shopping center and Village Center) were not subject to the NPP policies. Respondents do not respond to appellant's objection as to Village Center, but argue that the NPP policies would have been applicable to the Crossroads shopping center because it was approved and constructed prior to the City's establishment of the Redevelopment Planning District in that location. We think that uncertainty remains regarding these two challenged examples. Nevertheless, this discrepancy noted by appellant only relates to a part of the overall record and is insufficient to undo the remainder of the evidence on this point. Even if the disputed examples are not counted, there is still sufficient substantial evidence in the record to confirm respondents' position that there has been a consistent practice to treat the acreage and

---

[7] In addition, respondents assert two further examples of approvals of shopping centers where the NPP policies were allegedly in effect, but the acreage and square footage numbers of the NPP were exceeded (i.e., Obrien's Marketplace and the Crossroads shopping center).

square footage description in the NPP policy as a flexible guide to neighbor-hood development, rather than a strict limitation on the size of shopping centers.[8]

As we summarized above, general plan consistency may be found where a project is compatible with, and does not frustrate, the general plan's goals and policies. (*Napa Citizens, supra*, 91 Cal.App.4th at p. 378.) In deciding that question, we are required to accord great deference to an agency's determination that a project is consistent with its own general plan. (*Save Our Peninsula, supra*, 87 Cal.App.4th at p. 142.) That is because "the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity." (*Ibid.*) Furthermore, "[b]ecause policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes." (*Ibid.*)

In applying our deferential review, we decide whether the City's finding of consistency with the General Plan was "reasonable based on the evidence in the record." (*California Native Plant Society v. City of Rancho Cordova, supra*, 172 Cal.App.4th at p. 637.) "[A]s long as the City reasonably could have made a determination of consistency, the City's decision must be upheld, regardless of whether *we* would have made that determination in the first instance." (*Id.* at p. 638.) "An agency's finding that a project is consistent with its general plan can be reversed only if it is based on evidence from which no reasonable person could have reached the same conclusion." (*San Diego Citizenry Group, supra*, 219 Cal.App.4th at p. 26.)

 We find no abuse of discretion in the City's determination that the project was consistent with its General Plan, including the NPP policies. First, aside from the increased size of the shopping center over the prototypical size, the project fits and is compatible with NPP policies by placing a neighborhood-serving shopping center at the corner of an intersection served by two arterial streets, exactly as depicted on the NPP map, and complying with all other relevant policies. Second, the City's approval of a larger shopping center does not violate the General Plan because the NPP acreage and square footage descriptions were reasonably construed by the City as flexible guides to development, not rigid development limitations. That construction was reasonable based on the language of the NPP policies as well as the City's own past practices in applying the NPP provisions. For all

---

[8] We note that in the trial court, respondents distilled from the administrative record the "eight other shopping centers subject to NPP policies" that exceeded the acreage and square footage numbers stated in the NPP policy at issue. The eight were then summarized in a diagram that was attached to the trial court's ruling on petition for writ of mandate.

of these reasons, we uphold the City's determination that the project was consistent with the NPP policies of the General Plan.

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Compliance with CEQA**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The trial court's denial of the petition for writ of mandate and the resulting judgment in favor of the City is affirmed. Each party shall bear their own costs on appeal.

Hill, P. J., and Smith, J., concurred.

---

*See footnote, *ante*, page 9.